**RECEIVED**

JAN 2 1 2011

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| RYAN MARINE SERVICES, INC., ET AL | CIVIL ACTION NO. 06-2245 (LEAD) |
| | 08-0167 (MEMBER) |
| VERSUS | JUDGE DOHERTY |
| HUDSON DRYDOCKS, INC. | MAGISTRATE JUDGE HILL |

## MEMORANDUM RULING

Pending before the Court is a Motion for Partial Summary Judgment [Doc. 126] filed by defendant Hudson Drydocks, Inc. ("Hudson"). In its motion, Hudson moves for partial summary judgment "holding that Hudson is not liable, as a matter of law, unto plaintiffs for any alleged loss of use damages stemming from the repair/refurbishment work performed by Hudson in 2005 and 2006 on the plaintiff's vessel, the [M/V MR. SONNY],[1] nor as a result of the fire which occurred on January 31, 2006 on the said vessel, regardless of any findings of fault on the part of Hudson, which is denied." Defendant and third-party plaintiff, Great American Insurance Company of New York ("Great American"), Hudson's insurer, has filed a Motion for Leave to File a Memorandum [Doc. 128] in support of Hudson's motion for partial summary judgment, which is hereby GRANTED, and third-party defendants J&T Contractors, Inc. and Alea London Ltd. have filed motions asserting the same arguments and seeking the same relief as Hudson [Docs. 137 & 140]. Plaintiffs, Columbia Star, Inc, the owner of the vessel, and Ryan Marine Services, Inc., the operator of the vessel, oppose the motions.

---

[1] Throughout their motions, different parties have referred to the vessel in question variously as the M/V RMS CITATION, the M/V CITATION, and the M/V MR. SONNY. For the sake of clarity and consistency, this Court refers to the vessel as the MR. SONNY in all of its rulings.

As an initial matter, before this Court addresses the particulars of the motions filed, the Court notes the parties have framed the issue for summary judgment as one largely involving which entity – Hudson or Ryan Marine – is responsible for the delays in the certification process associated with the refurbishing of (or repair of, or construction of) the MR. SONNY.  Hudson's main argument is that the reason the vessel was not chartered until February 2007 was the delay in obtaining final ABS and Coast Guard certification for the vessel, a process that was delayed in large part by the need for ABS approval of the engineering, electrical, and structural drawings *of the new quarters added to the vessel, as well as the need for a new stability letter required by the ABS and Coast Guard due to the addition of the new quarters.*  Hudson argues it is undisputed the additional quarters were designed by Ryan Marine, and it is undisputed the vessel could not have been certified by the ABS until the ABS approved all of the engineering drawings associated with the additional quarters. Ryan Marine disputes that it caused the delay in chartering the vessel, as will be discussed in more detail below.

After conducting its own research, this Court believes, that perhaps, the parties have incorrectly framed the issue.  Although the parties have hinted at the following, without directly addressing it, it appears that in purchasing the MR. SONNY and hiring Hudson to "repair" the vessel, Ryan Marine was attempting to change the purpose/nature of the vessel.  It is undisputed Ryan Marine intended to charter the vessel as a four-point dive support vessel, a special purpose vessel.  Although not discussed, it appears the vessel had not been used in a such a capacity before being purchased by Ryan Marine.  What is clear is that the vessel could not be chartered as a four-point dive support vessel – the capacity in which Ryan Marine intended to charter the vessel – *until the "refurbishment" in question, which included the addition of new living quarters,*

-2-

*presumably for dive personnel, was completed and certified.*[2] Because the parties have not briefed the issue, this Court does not know which, if any, work that was being performed by Hudson included any of the foregoing vessel modifications, or whether Hudson merely contracted to "repair" certain aspects of the vessel, and later acted to repair all or part of any damage caused by a subsequent fire. However, the foregoing factual issue is pivotal to the issue of loss of use damages, and furthermore, could be pivotal to the issue of what law applies to the contract between Hudson and Ryan Marine. Indeed, if the contract between the parties is one *to repair a vessel*, maritime law would presumably apply. If the contract in question was one *to construct a vessel* – and here, the Court has question as to whether a contract *to re-fashion a vessel* into a special purpose vessel would be considered a "repair" contract or a "construction" contract – maritime law would presumably not apply. This Court, also, does not know whether Hudson was doing any of the work regarding the possible "refurbishment" if converting the vessel from a vessel of one type to another, or whether the contract between Ryan Marine and Hudson did not encompass the conversion of the vessel, rather, only true repairs, and thus, this Court cannot know whether the actual factual scenario would be seen as a contract to "repair" or to "construct" a vessel, or a hybrid. The foregoing issue has not been addressed by the parties.[3]

Against this backdrop, the Court will now address the motions. Considering the foregoing lack of clarity, and for the following reasons, the motions for partial summary judgment filed by Hudson, J&T, and Alea are partially DENIED for failure of the moving parties to carry their burdens

---

[2] This Court will here suggest the analogy of residential property that is being converted to commercial property that cannot be rented until certain industry modifications are made.

[3] What is clear is that contract was not initially a contract to repair fire damage, as the fire had not yet occurred at the time Ryan Marine retained Hudson, and additionally, this Court notes the living quarters, themselves, were manufactured by a third party.

and partially DENIED because of the existence of factual disputes as genuine, material facts.

I.     **Factual and Procedural Background**

A.     **The Undisputed Facts**

The following facts are undisputed by the parties:

1.     Plaintiff, Ryan Marine, purchased the subject vessel in late 2005 (then identified as the "MR. SONNY" and later re-named the "CITATION.")

2.     The MR. SONNY was built in 1980.

3.     Ryan Marine purchased the MR. SONNY in either November of December 2005 for $775,000 and renamed it the Citation. (See Exhibit C, Stan Hermann Depo., at p. 11, 14).

4.     At all times, Ryan Marine's intention was to have the Mr. SONNY ABS-class certified as a four-point dive support vessel. (See Exhibit D, Richard Ryan Depo., p. 46, lines 1-8; Also see Exhibit E. Ed Keown Depo., p. 25, lines 23-25; p. 26, lines 1-2; Also see Exhibit F, Dan Duplantis Depo., at p. 27-29).

5.     Ryan Marine did not know how much steel was going to have to be replaced to return the vessel to class and operational condition. (See Exhibit C, Stan Hermann Depo., at p. 15, lines 5-10).  Plaintiffs dispute the foregoing factual statement to the extent it indicates the vessel was not operational.  Plaintiffs argue the vessel was operational at the time they bought it.

6.     Ryan Marine delivered the MR. SONNY to Hudson's yard on or around December 27, 2005 for repair and refurbishment.

7.     Ryan Marine contracted with Hudson to do steel repair, replacement, and refurbishment of the MR. SONNY with the intention of placing the vessel back into service as an ABS-classed, four-point anchor dive support vessel.  (See Exhibit C, Stan Hermann Depo., at p. 13-15).

8.     The only writing reflecting the repair contract between Ryan Marine and Hudson was a December 29, 2005 letter agreement that signed by Mr. Richard Ryan, president of Ryan Marine on or about January 9, 2006.  (See Exhibit G, Letter Agreement, which was attached as Exhibit 11 to deposition of Lance Devillier at p. 28-29, which pages

are attached as Exhibit K).[4]

9.      That agreement provided that Hudson would repair the vessel on a "Time and Materials" basis. (See Exhibit G, Letter Agreement; Also see Exhibit E, Edward Keown Depo., at p. 17-18).

10.     At all relevant times, Ryan Marine intended and in fact did install an additional quarter to the vessel (aft-station) while the vessel was at Hudson's yard. (See Exhibit E, Edward Keown Depo., at p. 29-30) (See Exhibit F, Dan Duplantis Depo. at p. 45-46).

11.     The MR. SONNY could not be chartered as a dive support vessel until it was properly classed as such by the ABS, and until it received all of the proper certifications from the USCG and ABS. (See Exhibit F, Dan Duplantis Depo., at p. 61).

12.     Ryan Marine invited the ABS and the USCG to inspect the vessel to begin the re-classification process in early January, however, those inspections did not did not begin until January 27, 2006. (See Exhibit A, Sean Carpenter Depo., at p. 28, lines 14-25).

13.     Ryan Marine removed the Mr. Sonny from Hudson's yard on September 15, 2006. (See Exhibit E, Edward Keown Depo., at p. 175-176; Also see Exhibit K, Lance Devillier Depo., at p. 56, lines 18-25).

14.     Prior to September 15, 2006, all of the steel repair work completed by Hudson on the M\N Citation had been completely approved by the ABS during its final drydock inspection of the vessel in August 2006. (See Exhibit A. Sean Carpenter Depo., at p. 58; Also see Exhibit F, Dan Duplantis Depo., at p. 145; Also see Exhibit K, Lance Devillier Depo., at p. 219, lines 1-16).

15.     At no time during this time period, 2005-2006, did Ryan Marine have any charter agreement with any person for the MR. SONNY in place. (See Exhibit C, Stan Hermann Depo., at p. 22-23)

16.     In February 2007, Ryan Marine chartered out the MR. SONNY to a company named Seaquest. (See Exhibit E. Edward Keown Depo., at p. 101-102).

The parties dispute the following facts:

---

[4] Plaintiffs deny this statement and state Ed Keown, an employee of Ryan Marine who oversaw the repair of the vessel, is the only person who signed the document, and he "signed his name not that of Richard Ryan." This Court has reviewed the letter agreement, which forms the contract between the parties. The agreement is signed by "R.R. Ryan" for Ryan Marine. Mr. Keown's name appears nowhere on the letter.

Hudson contends as of November 2005, the vessel had been "laid up" since March 2003 by a previous owner prior to Ryan's purchase (*see* Deposition of Sean Carpenter, attached as Exhibit A to Hudson's Motion for Partial Summary Judgment, at p. 10, l. 15-18); when the vessel was put into lay-up, the MR. SONNY was not "operational," and had lost is Classification Society Certification with ABS as well as other United States Coast Guard certifications (*see* Deposition of Fred Dischler, attached as Exhibit B to Hudson's motion, at p. 13, ll. 14-16, ll. 21-22); and the prior owner decided to lay-up or "cold stack" the vessel because the estimated costs of repairing the vessel and replacing the steel necessary to pass the ABS re-certification survey would be approximately $3,000,000.00. (*see* Exhibit B, p. 12, l. 16 - p. 13, l. 16).  In support of its factual statements, Hudson presents the testimony of Mr. Carpenter, who stated he personally performed an intermediate survey of the vessel on April 23, 2003, and his records show "the owner elected not to complete the intermediate survey and to place the vessel in laid-up status," and that the vessel would have to be completely re-examined prior to completion of the survey as of April 23, 2003. Hudson also argues the terms "cold stacked" and "laid up" are in the business records of the ABS as produced at the deposition of Mr. Carpenter, ABS surveyor of the vessel. Hudson argues Mr. Carpenter gave direct testimony regarding these business records and testified a complete re-surveying, including gauging, would be required to return the vessel "to class" after 2003. Ryan Marine objects to the forgoing facts on grounds Mr. Carpenter was not the previous owner of the vessel and does not have direct information as to the truth of these assertions, nor is there sufficient explanation for the terms "cold-stacked" and "laid up."

The parties dispute whether Ryan Marine purchased the MR. SONNY "as is." Hudson argues Ryan Marine purchased the vessel "as is" without first conducting any official or unofficial

surveys to see what types of repairs would be needed to make the vessel operational and/or to obtain *the proper* class certification from the ABS and/or any and all other certifications required by the ABS and/or USCG.  (See Exhibit C, Stan Hermann Depo., at p. 11-13).[5]  However, Ryan Marine states its owner and another individual named Stanley Herman performed at least two unofficial surveys before purchasing the vessel.

The parties, also, dispute whether, at the time Hudson began the repair work in January 2006, Ryan Marine provided Hudson with a Scope of Work, outlining *the repair and refurbishment work* requested.  Hudson argues no scope of work was provided by Ryan to Hudson, citing the deposition testimony of Lance Devillier.[6]  Ryan Marine disputes the foregoing, arguing there was a scope of work citing the affidavit of Ed Keown; however, this Court could locate no information pertaining to the "scope of the work" under the agreement within the affidavit cited by Ryan Marine. Additionally, the parties dispute whether there was an agreement between Ryan Marine and Hudson regarding how long the repairs would take, or what the total cost of the job would be.  Hudson argues there was no such agreement between the parties, citing the testimony of Lance Devillier,[7] while Ryan Marine argues there was such an agreement, citing again the affidavit of Ed Keown.  This Court has reviewed the letter agreement between the parties, and concludes *the agreement itself* does not contain language regarding how long the repairs would take.  Additionally, contrary to the argument of Ryan Marine, Mr. Keown's affidavit does not contain a time frame for the work. Rather, Mr. Keown merely attests in his affidavit that in his "experience," the job *should have* been

---

[5]Neither party specifies what the nature of operation of the vessel might have been before undergoing the addition of the living quarters, and whether the "proper class certification from ABS" was to shift.

[6] *See* deposition of Lance Devilier, attached as Exhibit K to Hudson's motion, at pp. 45-46.

[7] *Id.*

completed in 5 months.

Hudson also asserts the following as undisputed facts:

1.     Ryan Marine did not request that the ABS perform a minimum scantling review (to determine what steel meets the ABS minimum thickness and what steel does not) on the MR. SONNY until February 19,2006, which was after the fire on board the vessel on January 31, 2006.  The request of the ABS review was "in order to obtain current information regarding the condition of the existing shell plating and internal structure." (See Exhibit F, Dan Duplantis Depo., at p. 39-40; Also see Exhibit L, February 19. 2006 letter from Dan Duplantis to ABS, attached as part of Exhibit 65 to Dan Duplantis' deposition at p. 69, which deposition is attached as Exhibit F).

2.     In order for the MR. SONNY to get properly classed by the ABS, the ABS had to first approve all engineering drawings related to the additional quarters being added to the vessel while it was at Hudson's yard. (See Exhibit A, Sean Carpenter Depo., at p. 101-106; Also see Exhibit F, Dan Duplantis Depo., at p. 46, 50).

3.     Ryan Marine, through its marine consultant, Dan Duplantis, did not send the engineering drawings of the proposed structural modifications, sanitary modifications and electrical revised load analysis for the proposed additional quarters to the ABS for technical review and approval until June 21, 2006. (Exhibit F. Dan Duplantis Deposition, at p. 45-46; Also see Exhibit H, June 21, 2006 letter from Dan Duplantis to ABS, attached as part of Exhibit 65 to Dan Duplantis' deposition).

4.     Furthermore, Ryan Marine, through its marine consultant, Dan Duplantis, did not send the ABS the revised structural drawings for the vessel regarding the addition of the new quarters areas, requesting that a new or modified tonnage certificate be issued by the ABS, until June 27, 2006. (See Exhibit M. June 27, 2006 letter from Dan Duplantis to ABS, attached as part of Exhibit 65 to Dan Duplantis' deposition).

5.     Additionally, Ryan Marine, through its marine consultant, Dan Duplantis, did not request copies from the ABS of the existing stability information on the MR. SONNY until August 16, 2006, wherein Ryan Marine advised the ABS for the first time by letter dated August 16, 2006 that the "addition of an additional quarter's section on the foc'sle deck... will require a submission to your office [ABS] requesting stability review" and requested information as to all stability data maintained by ABS. (See Exhibit N, August 16, 2006 letter from Dan Duplantis to ABS, attached as part of Exhibit 65 to Dan Duplantis' deposition). The August 16, 2006 letter to the ABS acknowledged that Ryan Marine had little documentation on the vessel, "[p]articularly any (in)formation (sp) involving the stability letter, stability data, tank tables, or previous calculations."

6.     Ryan Marine did not provide revised lightship calculations to the ABS regarding the

after modification data until August 25, 2006 by letter from Dan Duplantis to the ABS, in which letter Ryan Marine requested that ABS review the same to determine if the original stability letter information and loading chart could be modified without having to perform an additional inclining test and new stability data submission. (See Exhibit 0, August 25, 2006 letter from Dan Duplantis to ABS, attached as part of Exhibit 65 to Dan Duplantis' deposition).

7.    Furthermore, Dan Duplantis requested by letter dated October 3, 2006 that the ABS provide final approval of the quarters structural drawings in order to complete the ABS Class status. (See Exhibit P, October 3, 2006 letter from Dan Duplantis to ABS, attached as part of Exhibit 65 to Dan Duplantis' deposition).

8.    The ABS did not approve any of the drawings until October 19, 2006. (See Exhibit F, Dan Duplantis Depo., at p. 50; Also see Exhibit I, October 19, 2006 letter from ABS to Dan Duplantis, attached as part of Exhibit 66 to Dan Duplantis' deposition at p. 72, which deposition is attached as Exhibit F).

9.    Furthermore, ABS did not approve alterations made in prior submissions as to the quarters electrical drawings and the submitted details for the watertight doors until November 10, 2006 by letter dated November 10, 2006 to Dan Duplantis. (See Exhibit 0, November 10, 2006 letter from ABS to Dan Duplantis, attached as part of Exhibit 66 to Dan Duplantis' deposition).

10.   In November 2006, Ryan Marine and the ABS determined that new Stability Testing of the MR. SONNY would be required. A stability/inclining test is required by Coast Guard and ABS for the testing of the stability of a vessel and its seaworthiness. The vessel must have a stability letter issued on the vessel before it can be Coast Guard approved for being chartered as a diving support vessel. The stability testing required calculations on a U boom [A-Frame] that had not yet been installed on the vessel in November 2006. Nothing that Hudson did or did not do affected the decision by the ABS for the need for a new stability test on the vessel. (See Exhibit F, Dan Duplantis Depo., at p. 28-29, 56-57, 60-63, 103-106,236-237).

11.   The ABS did not approve all the drawings until December 2, 2006. (See Exhibit F, Dan Duplantis Depo., at p. 50; Also see Exhibit J, December 2, 2006 letter from ABS to Dan Duplantis, attached as part of Exhibit 66 to Dan Duplantis' deposition).

12.   A stability test was arranged for December 19, 2006 and canceled when the vessel was not ready for the test. The Stability/Inclining Tests were not performed on the vessel until December 26-28, 2006 and Dan Duplantis did not issue his report to the ABS until December 29,2006. Nothing regarding Hudson's work had anything to do with the delay of the stability test on December 19, 2006. (See Exhibit F. Dan Duplantis Depo., at p. 60-61, 106-109,235).

13.   The delay in the ABS approval process of these drawings or the need for an additional stability testing of the vessel had nothing to do with Hudson's work, good or bad, nor did it have anything to do with the fire. (See Exhibit F, Dan Duplantis Depo., at p. 50-51, 60-63,103-106,235-237).

14.   The Final Coast Guard and ABS inspections were not made on the vessel until February 1, 2007. (See Exhibit F, Dan Duplantis Depo., at p. 107- 109).

15.   The MR. SONNY did not receive its ABS class certification and all other necessary ABS and USCG certifications until February 5, 2007.   (See Exhibit A, Sean Carpenter Depo., at p. 29, lines 1-12; p. 76, lines 13-17).

With respect to Paragraphs 1-15 above, Ryan Marine asserts one of two general "denials" either: (1) "There was no need for Mr. Duplantis to send this earlier since in order to get final ABS and USCG approval the [steel] work and fire related damage needed to be repaired and that was not completed until February 5,1 2007;" or (2) "In order to get final ABS and USCG approval[,] a stability test was required[;] this could not be done until the fire related damage was repaired and that was not completed until February 5, 2007."

### B.   Procedural History

Ryan Marine filed suit against Hudson in November 2006 [Doc. 1], and filed an amended complaint against Hudson on May 29, 2008 [Doc. 32].  In its First Amended and Supplemental Complaint for Damages, Ryan Marine alleges eight causes of action against Hudson, as follows:  (1) breach of contract; (2) fraud; (3) negligence; (4) breach of implied warranty of good and workman services; (5) tortious interference with property/conversion; (6) negligent hiring, training, supervision or retention; (7) vicarious liability of employees; and (8) things within Hudson's control.

In Paragraph XII of its First Amended and Supplemental Complaint for Damages, Ryan Marine alleges the following against Hudson:

The repair work was unsatisfactory both in quality and in cost.  Hudson utilized unqualified personnel, which resulted in the necessity to have work redone and,

therefore, caused the vessel to be in drydock longer than normal or reasonable for the scope of work. This caused lost profit to Ryan. Hudson's unqualified personnel also caused a fire on the vessel during the repair. The cleanup and repair after the fire also caused the vessel to be in drydock longer than normal or reasonable for the scope of work. This caused lost profit to Ryan.[8]

(emphasis added).

In Ryan Marine's Fourth Set of Initial Disclosures, Ryan Marine claims it lost use of the vessel for the purposes of chartering and making a new profit for a period of 203 days prior to February 17, 2007 – or starting around September 2006 – as a result of the delays caused by the fire and/or Hudson's allegedly slow work.[9]

In the instant motion, Hudson argues it is entitled to dismissal of Ryan Marine's claim for loss of use damages stemming from the repair/refurbishment work performed by Hudson in 2005 and 2006 on the plaintiff's vessel, the MR. SONNY, as well as the alleged damages resulting from the fire which occurred on January 31, 2006 on the vessel, regardless of any findings of fault on the part of Hudson, which is denied; distinction is not made by either party as to which claims, whether grounded in tort or contract, the loss of use claims are made or from which the loss of use damages flow.

## II.   Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory

---

[8] *See* First Amended and Supplemental Complaint for Damages, Doc. 32, at ¶XII.

[9] Great American, Hudson's insurer, filed a separate Declaratory Judgment lawsuit in this Court (Civil Action 08-0167), asserting its policy does not provide coverage for all of Ryan Marine's claims against Hudson and noting it has provided a defense to Hudson in the Ryan Marine litigation subject to a reservation of rights. Great American seeks a declaration from this Court as to the extent of its coverage to Hudson under the MCL-B policy. That Declaratory Judgment lawsuit, which was originally assigned to Judge Melancon, was transferred to this Court and consolidated with the Ryan Marine/Hudson lawsuit. All consolidated cases are currently set for trial on this Court's docket on May 9, 2011.

judgment is sought may, at any time, move with or without supporting affidavits for a summary

judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b). Summary

judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56©.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618

(5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

> The plain language of Rule 56© <u>mandates</u> the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential

element of her case with respect to which she has the burden of proof."

. . . .

    . . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322-23 (1986)).

    The Fifth Circuit has further elaborated:

    [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal

quotations omitted).

    Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility

determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing

all the evidence, the court must disregard all evidence favorable to the moving party that the jury is

not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

## III.     Law and Analysis

### A.     Applicable Law

In the instant motion for partial summary judgment, the parties appear not to dispute the applicable law governing whether Hudson is liable to Ryan Marine for loss of use damages and/or loss of profit, whether couched in contract or tort, is the general maritime law. In its motion, Hudson argues general maritime law is applicable, and, also argues, the same legal standard applies, to both Ryan Marine's tort and breach of contract claims against Hudson; Ryan Marine does not dispute this.[10] However, the case cited by Hudson for these propositions – *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 379 (5th Cir. 2000) – provides only a questionable basis for the foregoing argument. In *Canal Barge*, a barge owner and the barge which had been engaged by Gulfstream, the buyer, to transport reconstituted fuel oil sold by Torco, an oil company, to Gulfstream, sued Gulfstream and Torco to recover damages arising from contamination and loss of use of its barge. Specifically, the barge owner sued Gulfstream for negligence and breach of contract, and sued Torco for negligence. After a bench trial before a magistrate judge, the magistrate judge ruled in favor of Canal Barge, holding Gulfstream and Torco jointly and severally liable. *Canal Barge*, 220 F.3d at 374. On appeal, the Fifth Circuit noted *the only claim addressed by the magistrate judge in his ruling was Canal Barge's tort claim.* In analyzing the barge owner's loss of use claim, however, the

---

[10] Hudson argues the plaintiffs' claims for loss of use/lost profit are asserted against Hudson under the general maritime law, as part of either the breach of a ship repair contract and/or for the tort of causing a fire aboard the vessel being repaired. Hudson argues under either claim – breach of contract or tort – the standard for recovery of loss of use for damage to a ship is the same under the general maritime law. Plaintiffs do not dispute this; however this Court has some question given the generalized nature of the arguments made.

-14-

Fifth Circuit applied one standard for determination of loss of use damages without parsing out separate standards for tort and breach of contract claims. Thus, it is unclear to this Court whether the Fifth Circuit was addressing only the magistrate judge's actual ruling, which addressed only Canal Barge's tort claims, or whether the Fifth Circuit was also applying the general maritime law standard for loss of use damages to Canal Barge's breach of contract claims. For this reason, the Court finds the case of *Canal Barge* not to provide the clear support argued by Hudson in the instant case, when Ryan Marine has alleged both tort and breach of contract claims against Hudson.

Beyond Hudson's perfunctory citation to *Canal Barge*, the parties have not briefed the issue of what law applies to each separate and distinct claim, asserted by Ryan Marine against Hudson. This Court's own research reveals jurisprudence that appears to confirm Hudson's argument that one standard applies, however, in *Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 50 (5 th Cit. 1967), the Fifth Circuit explained:

> It is well settled that a contract *to repair* a vessel is maritime. . . . Consequently, a shipowner has a **maritime cause of action** *whether he sues in contract for a breach of warranty of workmanlike service or in tort for the negligent performance of a maritime contract.* . . . . Federal law governs the construction of the terms of the repair contract, [ . . . . ], and would also appear to govern the standard of performance due under the contract.

(internal citations omitted)(emphasis added).[11]

Notwithstanding the foregoing, as the parties have failed to stipulate or brief the issue of whether the contract was in whole one to repair a vessel, or, also, one to construct a vessel, and what law applies to the contract under the specific facts at hand and/or the tort alleged, whether flowing

---

[11]As noted in previous rulings, in particular this Court's rulings on J&T's and Alea's motion for partial summary judgment against Hudson, this Court finds the Court's reference to "negligent performance of a maritime contract," quite interesting and notes, again, the parties', in this case, failure to identify, with particularity, the nature of each claim made as against each party in each instance, whether primary demand, third party demand, or cross complaint, and what law applies to each, and the unfortunate lack of clarity of that lapse.

from the negligent performance of the contract or otherwise, and what work Hudson actually did that was not fire related, this Court's comfort level is quite low with respect to what law governs each individual claim pled by Ryan Marine against Hudson, and, thus, whether the applicable law – under contract as opposed to tort or tort as opposed to contract – could encompass *the full scope of the damages* sought by Ryan Marine, and now sought to be dismissed by Hudson.

However, even if this Court were to assume the applicable law governing the issue of availability of loss of use damages under both tort and breach of contract claims under the particular factual circumstances alleged herein is the general maritime law and the standard for finding liability the same for each claim made, that does not, necessarily govern what *the scope of damages* might be for that particular claim couched under contract or tort. For example, it is unclear whether the contract language, itself, addresses damages for a breach, what they might be, and what the true nature of the contract was – to repair – inferring one scope of work and time frame – or to re-furbish – perhaps inferring a different time frame and scope, and the contract provisions, themselves, are disputed. Without these factual and legal distinctions having been squarely presented to the Court, this Court concludes it cannot grant the relief requested. There remain genuine issues of material fact in dispute, and unresolved legal issues that preclude the entry of summary judgment at this juncture, and, again, this Court suggests the issue has been framed improperly.

Under general maritime law, "[a] ship owner is entitled to damages for the loss of use of its vessel in addition to the cost of repairs of the vessel." *Canal Barge Co., Inc. v. Torco Oil Co.*, 220 F.3d 370, 379 (5th Cir. 2000, *citing Marine Transport Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1140 (5th Cir.1994). Included in such computations are damages resulting from reasonable delays in repair time. *See Domar Ocean Transp., Ltd. v. M/V Andrew Martin,* 754 F.2d 616, 619 (5th

Cir.1985). The ship owner has the burden to prove lost profits.   *See Dow Chemical Co. v. M/V Roberta Tabor*, 815 F.2d 1037, 1042 (5th Cir.1987).   To recoup damages for lost profits, "[s]omething more than the simple fact that the vessel was laid up for repairs must be shown – *a market for the vessel must be shown .*" *See In re M/V Nicole Trahan*, 10 F.3d 1190, 1194 (5th Cir.1994)(emphasis added).  But we do not require that lost profits be proven specifically. *See id.* at 1195. They need only be proven "with reasonable certainty." *See Domar Ocean*, 754 F.2d at 620 (quoting *The CONQUEROR*, 166 U.S. 110, 17 S.Ct. 510, 516, 41 L.Ed. 937 (1897)). It would seem, inherent in that inquiry is the necessity of knowing the purpose of the vessel, *which* market the vessel could serve and receive its profits, and when it could have entered *that* market, notwithstanding the fire damage.

In the instant motions, the moving parties argue during the entire 203 days claimed by Ryan Marine as the period of loss of use, the vessel in question was not able *to be chartered* because the vessel lacked final ABS and Coast Guard certification, a process which was not completed until February 5, 2007, approximately six months after Hudson had completed all *repair* work on the vessel and the vessel had left Hudson's shipyard.  In support of its argument, Hudson presents the testimony of Dan Duplantis, Ryan Marine's marine consultant who was in charge of obtaining ABS classification for this vessel, who testified the delay in obtaining ABS certification for the MR. SONNY was not due to any delay in the steel or repair work done by Hudson.  Rather, Hudson argues the delay in obtaining ABS certification for the MR. SONNY was caused in large part by the need for ABS approval of the engineering, electrical, and structural drawings *of the new quarters added to the vessel, as well as the need for a new stability letter required by the ABS and Coast Guard due to the addition of the new quarters.*  Hudson argues it is undisputed the additional

-17-

quarters were designed by Dan Duplantis during a period after Hudson began its work.  Furthermore, it is undisputed the MR. SONNY could not have been certified by the ABS until the ABS approved all of the engineering drawings associated with the additional quarters.

In response, plaintiffs again broadly argue Hudson is liable for "loss of use damages," because Hudson's substandard work caused delays in repairing the fire-related damage to the vessel. *Ryan Marine argues that, although Hudson had completed the steel work repairs by mid-September 2006, Hudson still had not repaired the interior fire-related damage at that point.  Ryan Marine contends the interior fire-related damage had to be completed before the vessel could seek and obtain ABS and Coast Guard approval, which was necessary for the vessel to go back to work.*[12] Thus, Ryan Marine argues the fire-related repairs were not completed until February 5, 2007; the vessel went to work approximately 2 weeks later; therefore, *Ryan Marine argues the ABS certification date is not relevant, as the vessel could not have gone back into service until the fire-related repairs were completed.*  Ryan Marine, also, argues, that for certification by the Coast Guard, a load line certification which requires incline/stability testing was necessary.  Ryan Marine presents the testimony of Sean Carpenter, an ABS marine surveyor, who testified such incline testing cannot take place "until the very end," and there must be less than 1% of work left to complete to make a vessel complete for such testing.[13]  Ryan Marine argues the forgoing facts are sufficient to show there are genuine issues of material fact concerning whether Hudson's conduct delayed the final certification of the vessel.  Plaintiffs, also, devote a large portion of their brief arguing they need not

_____

[12] This Court questions Ryan Marine's argument that it could not seek and obtain ABS certification of the vessel until the fire-related damages were completed, as, indeed, *the process* of getting ABS certification for the M/V MR. SONNY had begun before the fire occurred and continued throughout the process of the repairs.

[13] *See* deposition of Sean Carpenter, attached as Exhibit D to Ryan marine's opposition brief, Doc. 139, at p. 43, ll. 9-22.

put forth evidence demonstrating that an actual existing charter was breached in order to recover loss of use or lost profit damages under, this Court only can assume, its breach of contract claims, as Ryan must show, merely, that, in general, the ship could have earned profits had it been in use for the subject period.[14] Ryan Marine, also, argues it has presented sufficient evidence to establish there was an immediate market for the vessel, which could not be chartered because of damages resulting from the substandard conduct of Hudson, the necessary repair of which delayed the ultimate certification of the vessel; however, Ryan Marine does not distinguish not identify which market and whether the vessel, without the new living quarters and other changes, could have entered that market.

Hudson does not dispute that the fire-related damages needed to be repaired in order for the vessel to obtain full certification from the ABS and Coast Guard, although it does dispute Ryan Marine's assertion that the fire-related damages were not completed until February 5, 2007. Hudson, however, argues even if it is true the fire-related damages were not completed until February 5, 2007 – which would, presumably, mean another company completed those repairs, as it is undisputed the vessel was removed from Hudson's shipyard in September 2006[15] – that even if Hudson were at fault for that the delay in repairing the fire-related damage, the vessel still could not have been chartered as the type of vessel intended, until February 5, 2007 because the certification *of the living quarters* was not completed until that time, through no fault of Hudson.

---

[14] *See generally In re M/V Nicole Trahan*, 10 F.3d 1190, 1193 (5th Cir. 1994). Ryan Marine cites additional cases – not referenced herein – in support of this proposition.

[15] The circumstances surrounding when the fire-related repairs were made, and by which entity, has not been clarified by the parties. In its opposition brief to Alea's motion, Ryan Marine argues "...as of September 19, 2006, even after Ryan Marine removed the [MR. SONNY] from Hudson's drydock, there remained fire damage in need of repair." Although Ryan Marine does not name another company who might have completed the fire-related damage, the clear implication is that Ryan Marine removed the vessel from Hudson's custody and, thereafter, performed or had performed the alleged lingering fire-related repair work.

As previously noted by the Court, it is unclear which entity – Hudson or some other entity – might have completed the fire-related repairs, and when those repairs might have been made, and there is a dispute as to when the fire-related damage repairs were completed. Ryan Marine argues the repairs were not completed until February 5, 2007; Hudson denies this without providing an alternative date for completion of the repairs. What is known is that the vessel left the custody of Hudson in mid-September 2006; it is not known if the fire-related repairs were completed then or not until February 5, 2007. Again, the foregoing has not been clarified by the parties, and remains a genuine issue of material fact in dispute.

Furthermore, and perhaps more importantly, even if this Court were to assume Hudson was not at fault in failing to timely repair the fire-related damages, this Court concludes Hudson has not shown it is entitled to the relief it seeks by way of its motion, *vis-a-vis* loss of use damages, under either tort or contract, based solely on the cases it cites. Specifically, Hudson cites *Clyde S.S. Co. v. City of New York*, 20 F.2d 381 (2nd Cir. 1927), whose rationale was relied upon and followed by the Fifth Circuit in *Johnson v. Otto Candies, Inc.*, 828 F.2d 1114 (5th Cir. 1987), in support of its argument that Ryan Marine is not entitled to damages for loss of use damages under contract, tort, or quasi-contractual-based claims.

In *Clyde S.S.*, a ship collided with a ferry, and the ferry company was found to be solely at fault. The collision occurred in December, but because the damages to the ship were not serious, the ship continued its business, until it went in for its regularly-scheduled annual overhaul during the summer, which took 30 days. While the vessel was being overhauled, the ship simultaneously underwent repairs for the collision damages, which took 10 days. It was undisputed the collision-related repairs did not delay the work that was done to overhaul the vessel or the vessel's return to

-20-

service. 20 F.2d at 381.  The vessel owner sought loss of use damages for the vessel during the 10-day period during which the vessel was being repaired from the collision.  The district court denied loss of use damages, and on appeal, Judge Hand agreed, noting:

> If the owner of a damaged vessel puts her in dry dock *to repair damages done by a collision*, and *while she is there seizes the opportunity to make other repairs, which do not extend the time consumed in the collision repairs*, **the tort-feasor may not abate his damages.**  Hines v. Sangstad, 266 F. 502 (C.C.A. 1); Simpson's, etc., Co. v. Atlantic, etc., Co., 108 F. 425 (C.C.A. 1); The Acanthus, L.R. (1902) Prob. Div. 17.  **In such a case the tort-feasor cannot truly say that the detention and therefore the loss would have been less, had the owner deferred his own repairs.**  The ship by hypothesis had in any event to be taken out of commission, and must have lost her earnings during all the period she was laid off.  It is that loss and that alone which is the basis of detention damage.  The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937; The Winfield S. Cahill, 258 F. 318 (C.C.A. 2); The Saginaw (D.C.) 95 F. 703. *It must be treated as a matter of indifference* **to the tort-feasor** *that the owner gets an incidental benefit from the detention. He has as much lost the use of his vessel as though he did not make his own repairs, and he is not under any duty to share his windfall with the tort-feasor*.
>
> **But** *if the ship* **would in any event go out of commission, collision or no collision**, and if therefore, **during the period when the collision repairs are actually made, she would have earned no profits for her owner, he cannot be said to have been damaged.  The collision has not deprived him of earnings which he would have made at that season**.

20 F.2d at 381 (emphasis added).  *See also The Pocahontas*, 109 F.2d 929 (2nd Cir. 1940) (owner of vessel was not entitled to detention damages for period of time vessel was drydocked due to heavy weather damage that occurred subsequent to collision damage, where court concluded the vessel could have earned no charter hire during this detention period).

Approximately fifty years later, the Fifth Circuit decided *Delta Marine Drilling Co. v. M/V Baroid Ranger*, 454 F.2d 128 (5th Cir. 1972).  In *Delta Marine*, a drilling barge was damaged by a vessel when the vessel slammed into the fender system of the barge.  While the vessel underwent collision repairs, certain other unidentified non-collision repairs were made simultaneously.  The

-21-

owner of the barge, Delta Marine, brought suit against the owner of the vessel and the vessel in rem.
The case was tried, and judgment was rendered in favor of Delta Marine. The only issues appealed
to the Fifth Circuit were the amount of damages awarded to Delta Marine. One issue appealed was
whether Delta Marine was entitled to the full amount of loss of use damages due to detention of the
vessel. The district court held Delta Marine was entitled to the full amount of loss of use damages,
and the Fifth Circuit appealed, noting:

> Baroid further questions the district court's findings of lost time by arguing that time
> spent on repairs not caused by the collision should be excluded. There is no merit to
> this argument. The district court concluded, and we agree, that **the non-collision
> repairs performed here were performed simultaneously with collision repairs
> and did not extend the time of detention beyond that which was required for
> collision repairs**. In these circumstances **a vessel owner may recover for the full
> detention**.

*Delta Marine*, 454 F.2d at 131 n.10, *citing* Clyde S.S., *infra*.

Several years later, the Fifth Circuit decided *Johnson v. Otto Candies*, 828 F.2d 1114 (5th Cir.
1987), a case relied upon by Hudson in its motion for partial summary judgment. In *Johnson*, a
drilling rig was being moved from Galveston to Mobile, Alabama, where it was going to work for
Exxon. The rig was damaged while being tugged offshore, which delayed the Exxon project by 80
hours while the rig underwent repairs. At the same time those repairs were being made, the vessel
owner was able to hire divers to inspect the rig's spud cans, *a task that was unrelated to the
defendant's negligence and the repair work, but which was necessary in order for the rig to do
its work under its contract with Exxon*. The spud inspection took 26 hours. 8282 F.2d at 1118.
Following *Clyde S.S.*, the district court held the rig owner was not entitled to loss of use damages
from the defendant for those 26 hours because the rig would have had to undergo the 26-hour
inspection before going to work regardless of the defendant's negligence. *Id.* Consequently, the

court held the rig owner was not damaged by the 26-hour period in which the spud cans were inspected, and this amount was backed out of the 80–hour period (the amount of time it took to repair the collision-related damage) for which loss of use damages were awarded. *Id.*

The vessel owner objected to the district court's reduction of loss of use damages, citing *Delta Marine*. However, the *Johnson* court distinguished *Delta Marine*, as follows:

> Atwood challenges the district court's reduction as inconsistent with Fifth Circuit case law.  In support of its position, Atwood cites *Delta Marine Drilling Co. v. M/V BAROID RANGER,* 454 F.2d 128 (5th Cir.1972). In *Delta Marine,* we affirmed the district court's **refusal to reduce the loss of use award in a collision case for the time spent on other repairs which were performed simultaneously with the collision-related repairs and did not extend the time lost**    on account of the performance of the collision-related repairs. *Id.*  at 131.  ***However, there was no indication in Delta Marine that the noncollision repairs* were required in order for the vessel to do the tasks for which it was hired. *Instead, the implication was that these repairs were merely incidental.  This distinguishes Delta Marine from the case at hand.***
>
> That our decision in *Delta Marine,* properly construed, does not extend to cover the present circumstances is made clear by the authority we relied upon there. *See Clyde S.S. Co. v. City of New York,* 20 F.2d 381 (2d Cir.1927), *cited in Delta Marine,* 454 F.2d at 131 n. 10. In *Clyde,* where Judge Learned Hand authored the opinion, the Second Circuit affirmed the district court's **disallowance of a shipowner's damage claim for the ten days his vessel was undergoing simultaneously performed collision-related and other repairs**. The *Clyde* Court reasoned that ***since the repairs unrelated to the tort-feasor's actions had to be done that season, the owner would have lost the use of the vessel for that period of time regardless of the collision; therefore, he was not entitled to recover damages for the detention*.** In Judge Hand's words:
>
>> **"[I]f the ship would in any event go out of commission, collision or no collision, and if therefore, during the period when the collision repairs are actually made, she would have earned no profits for her owner, he cannot be said to have been damaged. The collision has not deprived him of earnings which he would have made at that season." 20 F.2d at 381**.
>
> The situation in *Clyde* is analogous to that here. The district court found, and the parties concede, that ***the spud can inspection on the VICKSBURG was necessary before the rig could begin drilling operations regardless of the Candies towing***

> *incident. Like the work done in Clyde, which was necessary for the ship's*
> *certificate but unrelated to the collision, the spud can inspection was not an*
> *"incidental repair" that could have been done at any time (including times when*
> *such work would not impair the earning capacity the vessel would otherwise have).*
> *Rather, the spud can inspection was a necessary prerequisite for the VICKSBURG*
> *to be able to do the very work Exxon hired it to do.*

*Johnson*, 828 F.2d at 1118-19 (emphasis added).  The  *Johnson* court went on to note the result

reached in the case was consistent with the principle underlying damage awards for loss of use.

Noted the court:

> The injured party may recover damages for lost income resulting from a collision, but
> only to the extent that those damages can be proven with reasonable certainty.
> *Bolivar County Gravel Co. v. Thomas Marine Co.,* 585 F.2d 1306, 1308 n. 2 (5th
> Cir.1978). Here, the district court found that **the VICKSBURG would have been**
> **out of service for the period of time required to complete the spud inspection.**
> **Thus, Atwood has suffered no loss from the detention of its vessel for that**
> **period.** *See Inland Oil and Transport Co. v. Ark-White Towing Co.,* 696 F.2d 321,
> 326-27 (5th Cir.1983) (no damages recoverable for loss of use of barge unless the
> vessel would have been used during time spent in repair). **The fact that Atwood was**
> **able to perform the spud inspection while the VICKSBURG was laid up for**
> **repairs does not alter this conclusion. Only actual damages are recoverable and**
> **Atwood suffered no damages for the period when but for the accident and**
> **subsequent repair the VICKSBURG would have been out of service.** *See*
> *Demetrius Maritime Co. v. S/T "Connecticut,"* 463 F.Supp. 1108, 1111
> (S.D.N.Y.1979) (*"If collision repairs are to be made while a ship would in any event*
> *be out of commission, earnings that would be lost during the time of repair ... cannot*
> *be regarded as consequences of the collision."*).

*Id.* at 1118-19.[16] (emphasis added)

---

[16] Hudson also cites *Bolivar Country Gravel Co., Inc. v. Thomas Marine Co.*, 585 F.2d 1306 (5th Cir. 1978), a case in which a dredge was damaged by a barge that broke free of its moorings. The dredge owner sued the barge owner. Concluding the dredge operator did not lose any sales, revenues or potential customers, the district court concluded the dredge operator was not entitled to loss of use damages, and the Fifth Circuit affirmed on appeal. This Court concludes *Bolivar* is not persuasive, as the factual scenarios are not sufficiently similar to either support or deny an award of loss of use damages in the instant case. Indeed, the court was not faced with the issue of whether loss of use damages are recoverable when two different types of repairs or refurbishment are simultaneously performed on a vessel.

This Court similarly concludes a case cited by Ryan Marine, *Merrill Stevens Dry Dock Co. v. M/V Yeocomico II*, 329 F.3d 809 (11th Cir. 2003) is similarly unpersuasive. Although the factual scenario is similar – a vessel owner contracted with a ship repair company to perform repairs to the vessel, and while the vessel, was in the

In the instant case, the parties focus on the issue of what caused the delay in obtaining final certification of the vessel and which party caused that delay; this Court suggests the focus is misplaced in light of the above cited jurisprudence. In its complaint, Ryan Marine argues the fire occurred in January 2006, but Hudson did not timely complete the fire-related damages, which ultimately delayed the chartering of the vessel. In its motion, Hudson argues the vessel could not be chartered notwithstanding the fire related repairs – and, therefore, could not have made a profit – until final certification of the vessel was obtained from ABS and the Coast Guard, and, thus, any delay in the process of obtaining this certification was not the fault of Hudson – as testified to by Dan Duplantis, Ryan Marine's own marine consultant – but was the result of Ryan Marine's own delay in obtaining certification of the new living quarters that were installed on the vessel, and those living quarters, and certification thereof, were necessary for the vessel to be chartered as a dive vessel. Again, Ryan Marine contends there was no reason for Dan Duplantis to begin the certification process prior to the time that he did, because the vessel could not be finally certified until the fire-related damages were repaired, and this did not occur until February 2007, because of the negligence of Hudson – thus, the arguments, as made, squarely place the issue within disputed facts.

First, as this Court has noted, there are disputed factual and legal questions that go to the heart of the matter, i.e. whether, and to what extent, Ryan Marine is entitled to loss of use damages. In *Delta Marine,* the Fifth Circuit affirmed the district court's refusal to reduce the loss of use award

---

custody of the repairer, the vessel caught on fire – the case is inapposite because the loss of use damages in question were awarded pursuant to a contract between the parties that specifically prescribed the circumstances under which loss of use damages would be awarded, and also because the case does not involve a situation where non-tortfeasor related repairs or other work are performed simultaneously with tortfeasor-related repairs, as is the factual scenario in the instant case.

in a collision case **for the time spent on other repairs which were performed simultaneously with the collision-related repairs** and *which did not extend the time lost on account of the performance of the collision-related repairs*. 454 F.2d at 131. In the instant case, the parties dispute the date the fire-related damages were completed. Ryan Marine argues the fire-related damages were not completed until February 5, 2007; Hudson disputes this but offers no date. Therefore, this Court cannot determine even that factual issue. However, even more importantly, the Court cannot determine the duration of the nature of, or the interplay among the three sets of work – here, the addition of the new living quarters and re-furbishing, the other "repairs," the need for which existed before the fire, and repair of the fire damage.

Furthermore, and perhaps more importantly, neither Hudson nor Ryan Marine has briefed the central issue as clarified by the above cited jurisprudence, necessary to this Court's analysis, *i.e.*, whether the "other work" that was performed – here, the addition of the new living quarters – was "required" or "necessary" in order for the vessel to be chartered, *as the type vessel it was chartered out as*, or was "merely incidental," that is, could have been done at any time, including times when such work would not impair the earning capacity of the vessel. Here, all parties have focused on the issue of which entity is at fault for the delay in obtaining final certification of the vessel – all agreeing final certification was required for the vessel to re-enter or enter the market. However, **neither has focused on the nature of or necessity of that certification as the facts might relate to the legal issues clarified by the applicable jurisprudence** . Again, in light of the noted jurisprudence, this Court concludes the parties have framed the issue incorrectly.[17] Hudson argues

---

[17] This Court notes the question of whether the certification of the vessel was essential to the vessel being chartered, as the type vessel it was being re-outfitted to become, is, of a threshold inquiry. However, it is also clear from the briefs of the parties that certification was often done on a piece-meal basis and arguably differs given the

-26-

the discrete certification process for the addition of the *new living quarters* – which was the choice of Ryan Marine – caused the delay in obtaining final certification of *the vessel* in this case; Ryan Marine argues the opposite, i.e. the substandard repair of fire related damage caused delay in obtaining final certification of *the vessel*.  However, the focus of the inquiry concerning loss of use damages is not the certification of the living quarters, or the vessel as a whole, but the nature of the work the vessel was to perform, its ability to engage in that activity and the interplay between those facts and the nature of the work performed and the ability of the vessel to have earned income as it relates to that work done; all questions which are central to both the nature of and the legal framing of both the contract and tort claims.  No party disputes that, once the process of adding living quarters was made, certification of the living quarters was required for the vessel to be chartered – as a vessel of that "class," nor that the vessel as a whole required certification before it could re-enter or enter the specific market.  Consequently, this Court concludes the more appropriate inquiry under the jurisprudence is whether the modifications – here, it would seem, the addition of the new living quarters or re-outfitting of the vessel, or the changing of the nature and purpose of the vessel – was necessary for the vessel to be chartered *as the type vessel it was let to charter within the market sought*, or whether that work was merely incidental to the vessel as a whole, as the vessel could have earned profits for the owner notwithstanding that work – and, the factual interplay between the three sets of work and the nature of the vessel and its market – a dichotomy not addressed by the parties, but central to the applicable legal question as defined by the jurisprudence.

---

"class" of the vessel.  For example, the steel work that was completed by Hudson had to be certified, and it was.  The fire-related repairs had to be certified, and they eventually were.  Similarly, the addition of the new living quarters had to be certified, and such certification was ultimately obtained.  A final certification and approval of the vessel **as re-outfitted**, was apparently required, and that was completed in February 2007.

Moreover, as noted, the Court, also, does not know whether the work that was being performed by Hudson, pursuant to the contract, included any of the foregoing modifications, or whether Hudson merely contracted to "repair" certain aspects of the vessel, and, thereafter, took on the repair necessitated by the fire. The foregoing issue – that is, the true nature of the contract been the parties – also, is pivotal to the issue of loss of use damages under either a contract claim, or a claim for "negligent performance under the contract," couched in tort, and furthermore, is pivotal to the issue of what law applies to those claims and thus what the scope of damages might be for loss of use. Indeed, again, if the contract between the parties is one to repair a vessel, maritime law would presumably apply; if the contract in question was one to construct a vessel or the contract or the work done is hybrid, neither party has addressed what law might apply. Again, the foregoing issues have not been addressed by the parties. Indeed, in *Clyde*, *Delta Marine*, and *Johnson*, the focus of the courts was on the necessity of the other work that was undertaken simultaneously with repairs occasioned by the conduct of a tortfeasor; that focus has not been found in the parties' presentations heretofore. Here, perhaps the repairs that are synonymous with the collision-related repairs in the cited cases are the fire-related repairs that were necessitated by the January 2006 fire on board the vessel; and the repairs, perhaps, synonymous with the repairs necessary for the vessel to create profits, are the re-furbishing and addition of the living quarters and final certification. Neither party has clearly addressed this interplay.

Hudson denies causing the fire, but it is undisputed Hudson assumed responsibility for making the fire-related repairs; however, the quality and duration of those repairs are disputed. From their briefs, it, also, appears the moving parties argue the "work" that was done simultaneously with the fire-related damages – and which it is argued caused the delay in obtaining final certification

-28-

of the vessel for charter – was the certification of the living quarters – a part, it would seem, of the re-outfitting of the vessel, while at the same time, arguing certification of the vessel as a whole was controlling and was governed by the vessel repairs.  Each argues the legal position and facts to support that legal framing, from their perspective, thus, becoming as "two ships passing in the night."  Each perspective has support and the manner by which the final determination of who will bear the loss or windfall is one not to be made by this Court, rather one which has been established by the appellant courts.  Consequently, this Court encourages each party, and as all parties' claims flow from the relationships between Hudson and Ryan Marine, the Court encourages all parties, to couch their arguments and martial their facts with that appellant determination in mind.

Therefore, this Court concludes the parties' focus on the certification process associated with the new living quarters without also, focusing on the nature and impact and consequence of the "work" is misplaced.  Rather, the focus should be on the nature of the "work" done and its impact on the vessel's ability to otherwise earn profits for its owner and the interplay between the two, or more, sets of "work" performed, and whether and which was necessary or merely incidental to the vessel being chartered as a dive support vessel.  The foregoing is a factual inquiry that governs the legal determination and one that has not been addressed by the parties.  Because the parties have not briefed the foregoing issues, factual or legal, and because there are disputed factual issues as to when the fire-related damages were actually completed,[18] summary judgment on the issue of loss of use damages is inappropriate at this time.

---

[18] The disputed factual issue of when the fire-related repairs were completed is material, because loss of use damages can only be awarded where the addition of the living quarters was merely incidental to the vessel being chartered and did not extend the time lost on account of the performance of the fire-related repairs.  Without knowing when the fire-related repairs were completed, the Court cannot determine whether the certification process for the additional living quarters extended the time lost on account of the performance of the fire-related repairs.

## IV.     Conclusion

Considering the foregoing, and for the reasons contained herein,

IT IS ORDERED that the Motions for Partial Summary Judgment filed by defendant Hudson Drydocks, Inc., J&T Contractors, Inc., and Alea London Ltd. [Docs. 126, 137, & 140] are partially DENIED  for failure of the moving parties to carry their burdens and partially DENIED because of the existence of genuine material factual disputes.

IT IS FURTHER ORDERED THAT the parties shall file an outline of claims pursuant to the sample outline form attached hereto, geared to, and conforming to the applicable appellate jurisprudence.[19]  Each party asserting a claim shall file an outline, and the responding party shall file a responsive outline within seven days thereafter.  Ryan Marine shall file the first outline on or before February 4, 2011.

THUS DONE AND SIGNED in Lafayette, Louisiana, this ___2 1___ day of January 2011.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

[19] This Court is aware it has previously required the filing of outlines in this matter.  However, this Court notes the same problems that have plagued the motion practice heretofore in this case continue with the addition of new parties and new claims, and this Court, with these rulings, directs all parties' attention to the cited jurisprudence and that jurisprudence's framing of the issue as to loss of use.

-30-